# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**CARLA HARRIS,**

**Plaintiff,**

v.

**ATTORNEY GENERAL OF THE UNITED STATES,**

**Defendant.**

**Civil Action No.  04-2203  (JDB)**

## MEMORANDUM OPINION

Plaintiff Carla Harris brings this employment discrimination suit against the Attorney General of the United States pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  Plaintiff alleges that the Executive Office for United States Attorneys ("EOUSA" or "agency") of the Department of Justice unlawfully terminated her services as a Personnel Security Specialist when her supervisor discovered that she was pregnant.  Now before the Court is defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment, both pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Defendant contends that plaintiff may not bring a Title VII claim against the federal government because she was not a federal employee and that, even if plaintiff was an employee, the EOUSA's actions were not discriminatory.  Plaintiff argues that she is entitled to summary judgment on the EOUSA's affirmative defense of failure to exhaust administrative remedies.  For the reasons

---

[1]  For ease of reference, the Court will refer to defendant's memorandum in support of its motion for summary judgment and defendant's reply as "Def.'s Mem." and "Def.'s Reply," respectively, and to plaintiff's cross-motion for partial summary judgment and plaintiff's reply as "Pl.'s Mem." and "Pl.'s Reply."

discussed below, the Court denies defendant's motion for summary judgment and grants

plaintiff's cross-motion for partial summary judgment.

## FACTUAL BACKGROUND[2]

Plaintiff worked for Integrated Management Services, Inc. ("IMSI"), a contractor for the

Department of Justice, from April through October 2002.  See Harris Dep. at 9.  After a brief

stint with another contractor, she discovered that she was pregnant, and returned to IMSI in early

2003, primarily to obtain a better benefits package.  See id. at 8-14.

Under a contract with the EOUSA, IMSI provided, among other things, "Security Support

Services," which included providing staff to be Personnel Security Specialists.  See Contract at

A-2, C-3.  Personnel Security Specialists "[c]onduct background investigations" for potential

Department of Justice staff, "[p]repare reports of investigations resulting from interviews

conducted during background investigations," and perform related tasks.  Id.  This position is part

of the EOUSA's mission to, in part, provide "operational support" and "administrative[] and

personnel services" to the United States Attorneys.  See Def.'s Consol. Stmt. ¶ 23.  Plaintiff,

through IMSI, was to work at the EOUSA offices as a Personnel Security Specialist,  repeating

an arrangement that had existed for several months in 2002 between plaintiff, IMSI, and the

EOUSA.  See Harris Dep. at 9, 14.

Although IMSI had hired plaintiff, IMSI's contract permitted the EOUSA to screen and

interview IMSI employees before they could work at the EOUSA.  Contract at C-17.  Thus,

plaintiff interviewed with Gloria Harbin of the EOUSA in late March 2003.  Harris Dep. at 50.

---

[2] Pursuant to Local Rule 7(h), plaintiff and defendant have each provided a statement of
material facts that they allege are not genuinely at issue.  Defendant consolidated these
statements and provided a response, which the Court refers to as "Def.'s Consol. Stmt."  The facts
summarized in this section are not in dispute except where noted.

Harbin was then the Chief of the Preemployment Security Division of the EOUSA.  Harbin Dep.

Vol. 1 at 12.  Her responsibilities in this position included interviewing candidates from

contractors and checking their references, establishing procedures for contract staff once hired,

and evaluating their work.  See Harbin Dep. Vol. 1 at 29-30, 211; Harbin Dep. Vol. 3 at 222.  At

the time of plaintiff's interview with Harbin, plaintiff was not visibly pregnant, and Harbin did

not think that plaintiff was pregnant.  See Harbin Dep. Vol. I at 40-41.  After interviewing

plaintiff and checking her references, Harbin approved plaintiff to begin work at the EOUSA.

   Plaintiff's first day of work at the EOUSA was two months later, on May 19, 2003.

Harris Dep. at 20.  By this time, plaintiff was visibly pregnant, so that "immediately when

visually [they] met, [EOUSA staff] could tell that [plaintiff] was pregnant."  Id. at 46.  Plaintiff

arrived at the EOUSA site around 1:00 pm after completing paperwork at IMSI that morning.  Id.

at 20.  Plaintiff was shown where she would be sitting, but was told to go to lunch because the

other staff were at lunch.  Id. at 21.  Plaintiff ate lunch and then had a "casual conversation" with

her previous supervisor at the EOUSA, Eric Dorsey.  Id. at 10, 22-23.  Afterwards, Cassandria

James, an IMSI contract employee, and Leslie Thompson, a non-contract federal employee, "told

[plaintiff] about the office" (id. at 23), and took plaintiff to the room where she was to work.

James Dep. at 65-66.  The room was a large copy room with three or four desks in it.  Id.

Plaintiff alleges that the chair that she was assigned was broken, and that she "needed a chair

with support because [she] was pregnant."  Harris Dep. at 26,  48.  Plaintiff had mentioned her

need for a new chair to Dorsey during her earlier conversation with him.  Id. at 23-24.  James,

however, recalls that there were no problems with the chair.  James Dep. at 74-75.

   There is disagreement in the record about plaintiff's behavior during her time with James

and Thompson.  James recalls that she "personally observed [plaintiff] yelling and using

profanity when expressing displeasure with the office space and her assigned desk" and "personally witnessed [plaintiff] complain for approximately 30 minutes in a very loud voice in an irate tone about her office space and desk." Id. at 38, 39. By plaintiff's account, on the other hand, plaintiff had a "[r]eal casual conversation" with Thompson and James. Harris Dep. at 25. Plaintiff does not recall cursing or being loud and irate, but acknowledged the possibility that she may have used a curse word in a casual manner. See id. at 33-34, 46-48 ("I don't recall using curse words," but "I might have sat in the chair and been like 'Oh shit I almost fell.'").

James subsequently told Harbin about plaintiff's alleged misbehavior. Harbin Dep. Vol. 1 at 56; James Dep. at 79, 105. Plaintiff does not dispute that James made the complaint but suspects that James lied to Harbin because James "knew that . . . [Harbin] had an aversion to women that were pregnant and that she might want to hear such a thing." Harris Dep. at 45. Harbin called Lisa Morrow, the employment manager at IMSI, and "stated that [plaintiff] had allegedly said out loud 'Oh hell no, this is not going to work' regarding her seating [and that plaintiff] 'ramped and raved' about how she was not going to sit where she was assigned." Lisa Morrow Documentation ("Morrow Doc.") at 1.[3] Harbin further told Morrow that she was considering removing plaintiff from the contract, depending on the outcome of a meeting with plaintiff that afternoon. Id.

The parties' accounts of that meeting are different. Harbin describes it as "quite the meeting," stating that plaintiff "gave [her] a lot of attitude." Harbin Dep. Vol. 1 at 77. Plaintiff, meanwhile, remembers "a very forgettable conversation" in which she "did mention to [Harbin]

---

[3] The Lisa Morrow Documentation is an internal IMSI record of the events surrounding plaintiff's stint at the EOUSA. It is not sworn testimony, but neither party objects to its validity, and both parties rely heavily on it in their filings.

that the chair that [she] had in the office was broken" but little more, though she does say that

Harbin was unpleasant "[a]bout everything [plaintiff] discussed with her." See Harris Dep. at 26,

30.  By all accounts, though, Harbin told Harris that she should contact Harbin if she wanted to

make any changes to her office space, such as by installing a computer.  See Harbin Dep. Vol. 1

at 80; Morrow Doc. at 1.

On the morning of the next day, May 20, plaintiff "ran into another guy that used to

work . . . there the first time that [plaintiff] was there," the IT support person, and suggested to

him during a casual "chit-chat" that she would like a computer in her office space.  See Harris

Dep. at 28.  Thereafter, Harbin called Morrow again, this time to request that plaintiff be

removed from the EOUSA contract.  Morrow Doc. at 1.  As explanation, Harbin reiterated her

concerns about plaintiff's behavior and complained that plaintiff had "broken the chain of

authority" by seeking a computer and a new chair from EOUSA staff other than Harbin herself.

Id.  Harbin also told IMSI that she was surprised that plaintiff had not mentioned before that she

was pregnant (id.), though Harbin later added that she "would think [plaintiff] would have

mentioned it, because it's such a joyful event, but it's irrelevant," Harbin Dep. Vol. 1 at 110.

IMSI complied and directed plaintiff to return to IMSI headquarters.  Harris Dep. at 31; Morrow

Doc. at 2.  When plaintiff returned to IMSI, IMSI staff recounted Harbin's issues to plaintiff, and

plaintiff responded that she was not aware of any of the issues that Harbin had cited.  Harris Dep.

at 32; Morrow Doc. at 2.  IMSI then issued plaintiff a letter stating that "[a]s there are no other

open positions matching your skills and experience, we will be unable to offer you employment

beyond today, May 20, 2003."  IMSI Ex. at 119.  However, IMSI found a position for plaintiff at

the Department of State the next day, see Hill Dep. at 53, and wrote the following note on the file

copy of the May 20 letter: "Rescinded - located temporary position at Dept. of State. Continues to

look for alternate Perm. position." IMSI Ex. at 119. Plaintiff began work at the Department of State the following Monday. See IMSI Ex. at 241.

Plaintiff now seeks relief for unlawful sex discrimination in violation of Title VII. Defendant initially moved to dismiss plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that plaintiff had failed timely to exhaust her administrative remedies under 29 C.F.R. § 1614.105(a)(1), because she failed to initiate timely contact with an Equal Employment Opportunity ("EEO") counselor and filed her EEO complaint on January 15, 2004, long after the period for exhaustion had expired. Harris v. Attorney Gen. of U.S., 400 F. Supp. 2d 24, 26 (D.D.C. 2005) ("Harris I"). Plaintiff objected that she was not aware of the time limit and that the statute does not impose the time limit on individuals who are not aware of it. Id. at 27. This Court granted defendant's motion, holding that plaintiff was on constructive notice of the time limit because of EEO posters at the EOUSA. Id. at 28. On appeal, the D.C. Circuit held that there was a genuine issue of material fact as to what the posters stated and whether they were posted, and remanded the case to this Court for further proceedings. Harris v. Gonzales, 488 F.3d 442, 446 (D.C. Cir. 2007) ("Harris II").

Now that discovery has been completed, defendants have moved for summary judgment on the ground that plaintiff was not a federal employee covered by 42 U.S.C. § 2000e-16 and, in the alternative, that the EOUSA actions were not discriminatory. Plaintiff has cross-moved for partial summary judgment, seeking to strike defendant's affirmative defense of failure to exhaust administrative remedies. These motions are now fully briefed and ripe for resolution.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

### I. Plaintiff's Status as an Employee

#### A. The Procedural Status of the "Employee" Requirement

The law protects "employees or applicants for employment" in the federal government

"from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. §

2000e-16(a).  Discrimination based on "sex" includes discrimination "on the basis of

pregnancy[.]"  Id. § 2000e(k).  However, to invoke this protection, plaintiff must demonstrate

that she was an "employee[] or applicant[] for employment" in the federal government.

Defendant contends that plaintiff was not an "employee" of the federal government,

which defendant characterizes as a condition of the government's waiver of sovereign immunity

to a Title VII claim.  Hence, defendant moves to dismiss plaintiff's claim for lack of subject

matter jurisdiction.  See Def.'s Mem. at 16-37; Def.'s Reply at 4-15.  In response, plaintiff

acknowledges that she must be a government "employee" to pursue a Title VII claim against

defendant.  But plaintiff contends that the requirement is not jurisdictional and that, instead, it

must be resolved on summary judgment.  In any event, plaintiff contends that the undisputed

evidence establishes that the EOUSA had such control over the terms and conditions of her

employment that she must be considered an employee of the EOUSA.  See Pl.'s Mem. at 28-39.

As a threshold matter, the Court must address whether the "employee" limitation in

section 2000e-16(a) is jurisdictional.  See Steel Co. v. Citizens for a Better Environment, 523

U.S. 83, 101 (1998) (requiring that courts resolve jurisdictional questions before considering the

merits of a case).  Defendant urges that the question is jurisdictional, citing Zhengzing v.

Tomlinson, No. 02-5267, 2002 WL 31926829, at *1 (D.C. Cir. Dec. 31, 2002) (per curiam).

Def.'s Reply at 14 n.6.  In that unpublished one-paragraph affirmation of a lower court decision,

the D.C. Circuit wrote that "[b]ecause appellant was not an employee of the Voice of America

for purposes of Title VII . . . , the district court correctly dismissed the complaint for lack of

subject matter jurisdiction."  Id. (emphasis added).  However, Zhengzing was decided before the

Supreme Court's decision in Arbaugh v. Y & H Corp., 546 U.S. 500, 511 (2006).  There, the

Supreme Court cautioned against using as precedent "drive-by jurisdictional rulings," id. (quoting Steel Co., 523 U.S. at 91), that dismiss claims "'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim," id. (quoting Da Silva v. Kinsho Int'l Corp., 229 F.3d 358, 361 (2d Cir. 2000)).

Arbaugh adopted a "clear statement" rule for determining whether a statutory prerequisite to suit is jurisdictional:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

Id. at 515-16 (citation omitted).[4]  Applying that rule here, the Court concludes that the "employee" requirement of section 2000e-16(a) is nonjurisdictional.  In Arbaugh, the Court held that the defendant's status as an "employer" within the meaning of 42 U.S.C. § 2000e was a question that went to the merits of the case, not a jurisdictional question.  Id. at 515.  The definition of "employee" that the Court must consider in this case is in the same section of definitions that was at issue in Arbaugh.  See 42 U.S.C. § 2000e(f).  Congress has not suggested that the definition of "employee" has any greater jurisdictional significance than the definition of "employer."  It would thus be difficult to establish that Congress has stated that the "threshold

---

[4] The D.C. Circuit has recently reiterated that "direct statutory language" is necessary to hold a statutory requirement jurisdictional in the context of exhaustion of administrative remedies.  Blackmon-Malloy v. U.S. Capitol Police Bd., 575 F.3d 699, 705 (D.C. Cir. 2009) ("To make compliance with a statutory provision a prerequisite to federal jurisdiction, a statute must include 'direct statutory language indicating that there is no federal jurisdiction prior to [such compliance].'") (quoting Avocados Plus, Inc. v. Veneman, 370 F.3d 1243, 1248 (D.C. Cir. 2004)) (brackets in original).

limitation" of status as an employee is jurisdictional.

To be sure, pre-<u>Arbaugh</u> decisions in this Circuit have treated the question as jurisdictional.  <u>See, e.g.</u>, <u>Bryant v. Orkand Corp.</u>, 407 F. Supp. 2d 29, 32, 35 (D.D.C. 2005); <u>Mason v. African Dev. Found.</u>, 355 F. Supp. 2d 85, 89, 98 (D.D.C. 2004).  Indeed, one post-<u>Arbaugh</u> decision states that "if [the plaintiff] was not a federal employee, this Court lacks jurisdiction over her Title VII claims."  <u>Coles v. Harvey</u>, 471 F. Supp. 2d 46, 50 (D.D.C. 2007).  However, this Court declines to follow <u>Coles</u> on this point, as it fails to acknowledge <u>Arbaugh</u>, relying instead on pre-<u>Arbaugh</u> precedent.  <u>See id.</u>  Other Circuits have shed such precedent in light of <u>Arbaugh</u>.  <u>See, e.g.</u>, <u>Xie v. Univ. of Utah</u>, 243 F. App'x. 367, 371 (10th Cir. 2007).  The Court therefore holds that the question of plaintiff's "employee" status in this case is so closely analogous to the question in <u>Arbaugh</u> that plaintiff's status must be considered a merits issue (<u>see</u> <u>Arbaugh</u>, 546 U.S. at 513-14), rather than a jurisdictional matter.  Because the parties have presented matters outside of the complaint, the Court will treat plaintiff's status as a matter for summary judgment, instead of failure to state a claim upon which relief can be granted.

## B.  Determination of Plaintiff's "Employee" Status

In determining whether plaintiff was an "employee" of EOUSA, the Court relies heavily on standards developed under the common law of agency, as applied in the Title VII context. The statute sets forth only a nominal definition of employee -- "an individual employed by an employer."  42 U.S.C. § 2000e(f).  Observing that this definition "is completely circular and explains nothing," the Supreme Court has encouraged courts to use "traditional agency law principles" to answer this question.  <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323 (1992).

This Circuit has applied two similar but distinct common-law agency tests to determine

whether a person is an "employee."  See Simms v. Dist. of Columbia, 587 F. Supp. 2d 269, 273-74 (D.D.C. 2008).  The first test is that found in Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979), and was developed to determine whether an individual who provided services directly to the government as an independent contractor, rather than as an employee of a government contracting firm, was an "employee" within the meaning of Title VII.  Id. at 830.  The "most important factor to review" under Spirides is "the extent of the employer's right to control the 'means and manner' of the worker's performance[.]"  Id. at 831.  In addition to this primary consideration of control, Spirides requires the Court to balance eleven factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i. e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

Spirides, 613 F.2d at 832.  However, this list is not exhaustive.  Id.  "Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative." Id. at 831.  Spirides has enjoyed broad acceptance in the Title VII context.  See, e.g., Bryant, 407 F. Supp. 2d at 33; Zhengxing v. Nathanson, 215 F. Supp. 2d 114, 117 (D.D.C. 2002).

The second test is that of NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117 (3d Cir. 1982).  The Browning-Ferris test addresses "joint employer" situations like this one in which the plaintiff may be an "employee" of two organizations at once.  See id. at 1122-23.  The Browning-Ferris test determines an individual's status by whether defendant "retained for itself sufficient control of the terms and conditions of employment of the employees who are employed

by the other employer." Id. at 1123.  Applied to this case, IMSI and the EOUSA would be "joint employers" if "they share or co-determine those matters governing the essential terms and conditions of employment." Id.  Although the Browning-Ferris standard was developed in the context of resolving employment law issues under the National Labor Relations Act, it has subsequently been applied in Title VII cases.  See, e.g., Int'l Union v. Clark, No. 02-1484, 2006 WL 2598046, at *6 (D.D.C. Sep. 11, 2006).

The D.C. Circuit has suggested in dictum that Browning-Ferris is better suited than Spirides to resolve "joint employment" discrimination cases like this one.  See Redd v. Summers, 232 F.3d 933, 937 (D.C. Cir. 2000) ("This court has never invoked Spirides to resolve an issue of joint employment . . . . For a joint employment test, a fairly standard formulation is that of the Third Circuit [in Browning-Ferris].") (emphasis added).  But the Redd court nonetheless applied Spirides rather than Browning-Ferris to that joint employment case, noting the assent of both parties to Spirides.  Id. at 938.  In this case as in Redd, the parties have emphasized the Spirides test in their briefs, and neither party objects to the application of that test.  See Def.'s Mem. at 18; Pl.'s Mem. at 26.  For this reason and because Browning-Ferris "is not terribly distinct from the primary consideration in the Spirides test," Dean v. Am. Fed'n of Gov't Employees, Local 476, 549 F. Supp. 2d 115, 122 (D.D.C. 2008), the Court will apply the Spirides test to determine whether plaintiff was an "employee" of EOUSA.[5]

Spirides demands "analysis of the 'economic realities' of the work relationship."  613 F.2d at 831.  Defendant's heavy reliance on the language of the EOUSA contract with IMSI to show that plaintiff was not an "employee" does little to advance this inquiry.  See, e.g., Def.'s Mem. at

---

[5]  Strict application of the Browning-Ferris test here would not, in the Court's view, yield a different result.

26-28 (arguing that contract provided that plaintiff was not an employee of EOUSA and that IMSI was responsible for supervising plaintiff).  While contracts manifest the parties' intent, they do not necessarily reflect "economic realities."  Spirides, 613 F.2d at 832-33 (holding that district court erred in relying "principally . . . on the contract language" which was not "controlling," and explaining that the court "should have reviewed all of the circumstances surrounding [plaintiff's] work relationship").

Moreover, in looking at the "economic realities of the work relationship," the Court is to look at the totality of the circumstances, and not only what happened in the few hours that plaintiff spent at the EOUSA offices on her first and only day there in May 2003.  See Spirides, 613 F.2d at 831.  Defendant's contention that the EOUSA could not have "employed" plaintiff because she spent only a taskless few hours there (Def.'s Mem. at 23) is inconsistent with the consideration of "economic realities" required by Spirides.  Moreover, that narrow focus would lead to absurd conclusions.  By this logic, an employer could hire an employee and fire him with impunity upon discovering, on his first day, that he was a member of a protected class.  It would also flow from defendant's logic that because neither IMSI nor the EOUSA actually controlled plaintiff's actions during the hours in question, neither organization employed her.  Finally, Title VII protects "applicants for employment," 42 U.S.C. § 2000e-16(a), which, although it does not directly apply to plaintiff's situation, anticipates an analysis that is not based solely on plaintiff's on-duty hours at the agency.  In determining whether plaintiff is an "employee," then, the Court will examine, inter alia, how the EOUSA planned to manage plaintiff by looking at how it managed other IMSI contractors who, like plaintiff, served as Personnel Security Specialists for EOUSA.

The parties' understandings of their anticipated roles show that the EOUSA would have

exercised the primary control over plaintiff's work.  Lisa Morrow, Employment Manager at IMSI,

answered regarding IMSI's employees at the Department of Justice:

> Q: And who actually controlled the substantive aspects of the tasks, the tasks that the
> IMSI people did?
> A: That was client driven.
> Q: So in other words, Miss Harbin would have controlled the tasks --
> A: Yes.
> Q: -- that Carla Harris would have been performing?
> A: Correct.

Morrow Dep. at 24.  Bill Noonan was plaintiff's nominal supervisor at IMSI, but he said of his

position that "I wouldn't call it supervision" and that he "had very little intact [sic] with the eighth

floor [where plaintiff was to work] at all but I knew there were some people up there."  Noonan

Dep. at 8-9.  Pressed to describe his supervisory duties, Noonan replied that "I was more of a

liaison person between IMSI and the government." Id. at 8.  Noonan explained that Harbin

provided the supervision over the IMSI contractors in her group, setting their schedule and

duties, and also providing the performance evaluations.  Id. at 17-18.  On the EOUSA side,

Harbin agreed that she "establish[ed] the procedures that Carla Harris would have followed had

she stayed on[.]"  Harbin Dep. Vol. 3 at 222.  Harbin would also "check up" on contract

employees "to make sure that the work was flowing" and "would approve it or disapprove it."

Harbin Dep. Vol. 1 at 211.  These tasks are supervisory, and they fell to the EOUSA, not to

IMSI.

In addition to the "control" element, which is the heart of the Spirides test, other Spirides

factors support the conclusion that plaintiff was to be a federal employee.  Defendant's

furnishing, or alleged failure to properly furnish, plaintiff's work environment is a key issue in

this case.  Plaintiff was paid a salary, like an employee, rather than by the job, like a contractor.

Harris Dep. at 17; IMSI Ex. at 271.  Plaintiff's tasks as a Personnel Security Specialist were

integral to the overall mission of the EOUSA, insofar as one of that organization's stated "major functions" is to "[p]rovide operating personnel and security administrative services, as well as Federal personnel policy and procedural guidance[.]"  EOUSA Mission Stmt. at 2.  Indeed, she would have provided the same personnel security services as those performed by federal employees at the EOUSA, and she would have been supervised in the same manner.  See Harbin Dep. Vol. 2 at 115; Harbin Dep. Vol. 3 at 222; Thompson Dep. at 86-87.

On the other hand, from a purely quantitative perspective, a greater number of the secondary Spirides factors favor defendant's stance that plaintiff was not a federal employee.  As noted earlier, the IMSI contract with DOJ provided that there was no employer-employee relationship between IMSI contractors and the government.  See Contract at H-3.   IMSI also retained the ultimate authority to terminate plaintiff.   Hence, although the EOUSA was able to remove plaintiff from its contract with IMSI, the entity that technically terminated plaintiff was IMSI, not EOUSA.  IMSI Ex. at 119.  IMSI paid her, accrued vacation time for her, and withheld her Social Security taxes.  Id. at 145-46; see also Krimkowitz Aff. ¶¶ 3, 4 ("[Plaintiff's] salary and benefits were provided by IMSI.").  But, on balance, these factors -- focused largely on payroll matters and formalization of hiring and termination -- do not outweigh the evidence discussed above showing that EOUSA had the "right to control the 'means and manner' of the worker's performance," Spirides, 613 F.2d at 831, and hence should be considered plaintiff's employer under Title VII.

The question whether a person is an "employee" under Title VII has frequently come before the courts of this Circuit, but the outcomes of those cases do not dictate the resolution of this case.  Defendant cites to several cases holding that various types of contractors were not government employees, but the facts of those cases differ materially from the facts presented

-15-

here.  See, e.g., Redd, 232 F.3d at 938 (holding that a tour guide whose federal supervisor

directed the plaintiff's employment just once in nine months was a contractor); Simms, 587 F.

Supp. 2d at 274 (holding that a mental health worker providing services to inmates with no

direction from prison personnel was a contractor); Amiri v. Stoladi Prop. Group, 407 F. Supp. 2d

119, 124 (D.D.C. 2005) (holding that a security guard was not an employee of a property

manager with "no authority to direct or control" him); Mason, 355 F. Supp. 2d at 90-98 (holding

that a receptionist for a government agency was a contractor where the work was initially

arranged through a temporary services agency, the services were not integral to defendant's

business, and the receptionist paid her own social security taxes); Zhengxing, 215 F. Supp. 2d at

117-20 (holding that a translator and producer of radio programs, working independently and

paid by the assignment, was a contractor).  In most of these cases, the individual in question was

an outside expert brought in to handle a task that the organization itself did not do and thus could

not supervise.  In Redd and Mason, the nature of the work was not specialized, and it could be

done independently of the organization's main function.  In this case, by contrast, plaintiff was

hired to do a specialized job that was part of the EOUSA's mission under Harbin's express

supervision.

        Plaintiff contends that this case is more like Int'l Union v. Clark, 2006 WL 2598046, in

which the court held that court security officers hired by contract but trained and directed by the

United States Marshals Service were federal employees.  Id. at *8.  That case, which applied

Browning-Ferris rather than Spirides, is not exactly on point, but it is instructive.  In that case as

in this one, the government determined the qualifications for hiring and the tasks that the officers

performed, specified the manner in which the tasks were performed and the daily duties,

provided the essential equipment for the job, and decided whether to remove individual officers

from the contract.  Id.  To be sure, Int'l Union presented indicia of an employment relationship

that are absent from this record:   the agency conducted a two to three day residential training

program for the officers, id. at *2, and the officers often "serve[d] in the same capacity, in the

same courthouse, under a succession of different contractors," id. at *8 n.13.  But the level of

control exercised by the agency in Int'l Union is, on the whole, strikingly similar to the level of

control exercised by the EOUSA with respect to plaintiff.

 Weighing all of the factors and the comprehensive record that the parties have provided,

the Court concludes that, under the principles of agency law set forth in Spirides, Browning-

Ferris, and their progeny, plaintiff was an employee of the EOUSA for Title VII purposes.

EOUSA employees, particularly Ms. Harbin, were to direct plaintiff's daily tasks in the same way

that they would direct and evaluate federal employees who worked alongside plaintiff performing

identical work.  See Harbin Dep. Vol. 1 at 209, Vol. 2 at 115; Krimkowitz Aff. ¶ 6.  IMSI's role,

on the other hand, was largely limited to providing paychecks and administering benefits.  See

Def.'s Consol. Stmt. ¶¶ 32-38.  Therefore, notwithstanding the contract's statement that IMSI

contractors are not to be considered employees of EOUSA, the level of control exercised by

EOUSA over plaintiff and the economic realities of the workplace demonstrate that plaintiff was

an "employee" within the meaning of Title VII.  Accordingly, the Court will deny defendant's

motion for summary judgment on this issue.

## II.  Exhaustion of Administrative Remedies

 Defendant has twice asserted the affirmative defense of failure to exhaust administrative

remedies -- first, in a motion to dismiss filed in 2005 which was granted by this Court, and

subsequently, in its answer to the complaint, following the resolution of plaintiff's appeal.  See

Harris, 488 F.3d at 446; Def.'s Answer at 1.  In response, plaintiff has now moved for summary

judgment on this defense, on the ground that exhaustion would have been futile.  See Pl.'s Mem.
at 39-42; Pl.'s Reply at 1-2.

Exhaustion of administrative remedies is not required where exhaustion would be futile.
See Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985) ("[T]he administrative deadlines [of Title
VII] are not jurisdictional.  Rather, they function like a statute of limitations and, like a statute of
limitations, are subject to waiver, estoppel and equitable tolling.") (internal citations and
quotation marks omitted); James v. U.S. Dep't of Health & Human Servs., 824 F.2d 1132, 1138
(D.C. Cir. 1987) (exhaustion of administrative remedies is not required where it would be
"futile" because of "certainty of an adverse decision," such as where there is a "prior indication
from the agency that it does not have jurisdiction over the matter").

Here, plaintiff contends that, had she initiated EEO counseling within the designated time
period, it would have made no difference because defendant believed that plaintiff was not a
federal employee.  Defendant has mounted no opposition to this contention.  Indeed, Rita
Sampson, defendant's designated witness on the issue of plaintiff's EEO complaint, stated that

> Carla Harris was not an employee.  So we would not have investigated this case.
> We would have done the exact same thing [as we did when plaintiff brought her
> complaint after the forty-five day deadline] which would be to prepare a
> recommendation to the Department of Justice EEO officer that the case be
> dismissed.

Sampson Dep. at 67 (objection omitted).  Plaintiff further supports her motion with her statement
of material facts not at issue, submitted pursuant to Local Civil Rule 7(h).  See Pl.'s Stmt. at 13-
14.  Defendant has not contested plaintiff's motion or these facts in his rebuttal statement or in
his briefs.  "If the opposing party does not . . . respond, summary judgment should, if appropriate,
be entered against that party."  Fed. R. Civ. P. 56(e)(2).  Considering this factual record and the
lack of any opposition by defendant, the Court will grant plaintiff's cross-motion for partial

summary judgment and strike this defense.

## III. Discrimination

The Court considers defendant's motion for summary judgment on the merits under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence. Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)). The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. If it is necessary to assess defendant's proffered reason, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." See Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)). In other words, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision

was made for a discriminatory reason."  <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

In this case, plaintiff has presented a prima facie case of discrimination.  Plaintiff alleges that Harbin offered her the position at EOUSA before learning that plaintiff was pregnant, but that Harbin then released her from the contract upon learning that plaintiff was pregnant.  <u>See</u> Compl. ¶¶ 5, 9, 11.  Plaintiff's account of her time at the EOUSA includes none of the unprofessional behavior that defendant alleges.  Plaintiff supports her prima facie case with evidence that Harbin told IMSI staff that "she was surprised that [plaintiff] had not mentioned" that she was pregnant, although Harbin acknowledged that plaintiff's pregnancy "is not an issue and does not matter."  Morrow Doc. at 1.  Harbin also admits she expressed surprise that plaintiff had not mentioned she was pregnant. Harbin Dep. Vol. 1 at 110.  In addition, plaintiff offers testimony from four female contract employees whom Harbin released around the time that she learned that they were pregnant.  <u>See</u> Reid-Jackson Dep. at 19-21; Flipping Dec. ¶¶ 5-7, 8-10; White Dep. at 8-11; Thompson Dep. at 37.

In response, defendant has proffered nondiscriminatory reasons for releasing plaintiff from the IMSI contract.  To justify her decision, Harbin cites staff complaints that plaintiff was using "profanity" and "being disruptive and loud in front of the . . . staff" because of dissatisfaction with her assigned chair and the room in which she was to work.  Harbin Dep. Vol. 1 at 52.  One other contract employee's testimony supports these complaints.  James Dep. at 38-39, 69, 74 (stating that she "personally observed Carla yelling and using profanity when expressing displeasure with the office space and her assigned desk" and "personally witnessed Carla complain for approximately 30 minutes in a very loud voice in an irate tone about her office space and desk.").  Harbin further states that plaintiff "took it on her own to contact our IT staff" to get a computer and "took it on her own to contact whoever else she wanted concerning a

chair," even though the EOUSA's hierarchy required that plaintiff seek both items through Harbin.  See Harbin Dep. Vol. 1 at 80.  Plaintiff acknowledges that she sought both a computer and a new chair through EOUSA employees other than Harbin.  Harris Dep. at 23-24, 28.  Such behavior, taken together, could justify Harbin's conclusion that "I am not going to have anyone on my staff being so disruptive like [plaintiff] was, and not being a team player, and being so insubordinate on the staff[.]"  Harbin Dep. Vol. 1 at 81.

But plaintiff has submitted evidence raising a genuine issue of material of fact as to the credibility of defendant's proffered nondiscriminatory reason for her release.  Plaintiff denies being loud and disruptive, characterizing her conversations with James and Thompson -- the only people present during the alleged misbehavior -- as a "[r]eal casual conversation" in which James and Thompson just told her "about the office." Harris Dep. at 25.  She does not recall using the profanity described by James, though acknowledging that she might have been "startled" at one point and possibly uttered a single profanity when she first sat in the broken chair.  Harris Dep. at 25, 48 ("I might have sat in the chair and been like 'Oh shit I almost fell.'").  Indeed, Thompson has no recollection of plaintiff being loud and disrespectful or otherwise disruptive.  See Thompson Dep. at 44-45.  Furthermore, notes taken at the time that the EOUSA removed plaintiff from the contract buttress plaintiff's recollection. Upon returning to IMSI headquarters, plaintiff appeared to be confused about why the EOUSA had terminated her, stating that "[e]verything was fine."  Morrow Doc. at 2.  Plaintiff had not contacted Bill Noonan, her nominal supervisor at IMSI, because "she was not aware that there were any problems" with her arrangements at the EOUSA or with Harbin.  Id.

A reasonable jury weighing the inconsistent testimony, as well as Harbin's surprise at plaintiff's pregnancy and her treatment of other pregnant contractors, could find that plaintiff did

not engage in disruptive behavior on May 19, 2003, and that Harbin used the alleged incident,

along with plaintiff's improper request for a chair and computer, as pretext for firing plaintiff

because she was pregnant.  Because the record presents genuine issues as to material facts, the

Court will deny defendant's motion for summary judgment.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny defendant's motion for summary judgment

and grant plaintiff's cross-motion for partial summary judgment with respect to exhaustion of

administrative remedies.  A separate order will be issued with this opinion.


_____/s/_____
JOHN D. BATES
United States District Judge

Date:  September 24, 2009